1
2
3
4                    UNITED STATES DISTRICT COURT

5                   EASTERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| **ASSOCIATION OF IRRITATED RESIDENTS, an unincorporated association**<br><br>                      **Plaintiff,**<br><br>      **v.**<br><br>**C&R VANDERHAM DAIRY, a California Proprietorship, and RICK VANDERHAM and CORRIE VANDERHAM, owners and operators, CORRIE VANDERHAM DAIRY, INC., a California corporation, AG RESOURCES, LLC, a California limited liability company,**<br><br>                   **Defendants.** | **1:05-CV- 01593 OWW SMS**<br><br>**MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE FOLLOWING ISSUES**<br><br>**1.    DEFENDANTS FAILURE TO OBTAIN AN AUTHORITY TO CONSTRUCT PERMIT**<br>**2.    DEFENDANTS FAILURE TO INSTALL BEST AVAILABLE CONTROL TECHNOLOGY ("BACT")**<br>**3.    DEFENDANTS' FAILURE TO PURCHASE OFFSETS**<br><br>**ALL IN VIOLATION OF THE CALIFORNIA STATE IMPLEMENTATION PLAN ("SIP")** |

18

19                    1.   **INTRODUCTION**

20       Plaintiffs' Association of Irritated Residents ("AIR") filed

21   a complaint against Defendants C&R Vanderham Dairy alleging

22   violations of the Federal Clean Air Act ("CAA"), 42 U.S.C. §§

23   7401 et. seq.  Plaintiffs move for summary judgment arguing that

24   C&R Vanderham Dairy has violated and continues to violate

25   California's State Implementation Plan ("SIP") by violating of

26   San Joaquin Air Quality Management District ("District") Rules

27   2010 and 2201.  Defendants oppose the motion.

28   ///

                                1

1          **2.  PROCEDURAL BACKGROUND**

2  **A.   Plaintiffs' Motion for Summary Judgment**

3          Plaintiffs filed their First Amended Complaint ("FAC") on

4  October 21, 2006.  (Doc. 58, First Amended Complaint, Filed

5  October 21, 2006.)  Plaintiffs then filed a motion for summary

6  judgment on April 19, 2007.  (Doc. 92, Memorandum in Support of

7  Motion for Summary Judgement by AIR, Filed April 19, 2007.)  In

8  support of their motion for summary judgment, Plaintiffs filed

9  the Declaration on Avinash Kar.  (Doc. 84, Declaration of Avinash

10 Kar, Filed April 6, 2007.)

11         On may 4, 2007 Defendants opposed Plaintiffs' motion and

12 submitted their response to Plaintiffs' statement of facts.

13 (Doc. 96, Opposition, May 4, 2007.; Doc. 97, Defendants' Reply

14 to AIR's Separate Statement of Undisputed Facts, Filed May 4,

15 2007.)  In support of their opposition Defendants also submitted

16 the Declaration of David R. Albers.  (Doc. 98, Declaration of

17 David R. Albers, Filed May 4, 2007)  Plaintiffs replied to

18 Defendants opposition on May 14, 2007.  (Doc. 100, Plaintiffs'

19 Reply, Filed May 14, 2007.)

20         Plaintiffs' motion for summary judgment was heard on May 21,

21 2007.  At Defendants' request, Defendants were given leave to

22 file a supplemental brief on the matter.  Defendants filed their

23 supplemental brief on May 29, 2007.  (Doc. 113, First Amended

24 Supplemental Brief.)  Plaintiffs replied with their own

25 supplemental brief on June 5, 2007.  (Doc. 119, Plaintiffs

26 Supplemental Brief.)

27 **B.   Defendants Cross Motion for Summary Judgment**

28         On June 15, 2007 Defendants filed a cross motion for summary

**2**

1  judgment.  (Doc. 123, Motion for Summary Judgment.)  On July 23,

2  2007 Plaintiffs filed a motion to strike and opposition to

3  Defendants' cross motion for summary judgment.  (Doc. 139.)  On

4  July 23, 2007 Defendants replied. (Doc. 143.)

5  ### 3.  <u>FACTUAL AND LEGAL BACKGROUND</u>

6  **A.   Defendants Vanderham Dairy**

7       Defendants C&R Vanderham operate the dairy facility owned by

8  Corrie Vanderham Dairy, Inc.  Rick Vanderham and Corrie Vanderham

9  Dairy, Inc. are partners in the C&R Vanderham Dairy.

10      The C & R Vanderham Dairy is located in Kern County, which is

11  within the San Joaquin Valley Air basin.  As an operating dairy

12  farm, it generates certain emissions. As a result, it is subject to

13  regulation by the Air District.

14      On April 29, 2005, Defendant Ag Resources, LLC entered into a

15  site improvement construction agreement with Vander Weerd General

16  Construction, Inc. to build the C & R Vanderham Dairy. The dairy

17  was constructed to limit the project size to one thousand three

18  hundred twenty (1,320) milk cows, one hundred ninety-five (195) dry

19  cows, four hundred eighty-six (486) heifers aged over fifteen (15)

20  months, three hundred seventy-eight (378) heifers aged seven (7) to

21  fourteen (14) months, one hundred sixty-two heifers four (4) to six

22  (6) month and one hundred twenty (120) calves.  This information

23  was provided to the Air District. (Doc. 98, Albers Declaration, Ex.

24  "A", "F", "G" and "H", Filed May 4, 2007.)  The correspondence

25  between defendants and the Air District shows that the dairy would

26  in fact be constructed in such a way as to limit the cow numbers to

27  those levels.

28      On or about July 15, 2005, construction of the dairy

**3**

facility began. The dairy was completed in June 2006, and the C &
R Vanderham Dairy became operational at that time.  At the time
construction began, the Air District used an emission factor of
12.8 pounds of VOC per cow head per year. In August 2005, the Air
District changed the emission factor to 19.3 pounds of VOC per
cow head per year.  Since construction of the dairy began in July
2005, the District used the 12.8 pounds per cow head factor.  A
permit to operate was issued to the C & R Vanderham Dairy in
April 2007. (Doc. 98, Albers Declaration, Ex "C.")

**B.    The Clean Air Act**

     The general purpose of the CAA is to enhance the nation's
air quality resources for the benefit of public health.  The CAA
requires the United States Environmental Protection Agency
("EPA") to set National Ambient Air Quality Standards ("NAAQS")
for certain pollutants.  The CAA requires states to designate
areas within its boundaries as "attainment" areas if the air
quality meets the NAAQS for a particular criteria pollutant.
Areas where the air quality does not meet the NAAQS for a
particular criteria pollutant are designated as "non attainment"
areas for that pollutant.

     Non attainment areas are required to adopt state
implementation plans ("SIP") to achieve the NAAQS by the
applicable attainment date.  The CAA requires that a SIP shall
"require permits for the construction and operation of new or
modified major stationary sources anywhere in the non attainment
area."  A preconstruction permit is a New Source Review ("NSR")
permit.  The San Joaquin Valley Air Pollution Control District is
the state agency with primary responsibility for developing the

1  SIP for the San Joaquin Valley. Cal. Health & Safety Code §§
2  40600-40606.

3      "Although states retain significant flexibility in
4  establishing the details of these plans, the CAA, and EPA
5  regulations, outline many required features." *Safe Air for*
6  *Everyone v. EPA,* 475 F.3d 1096, 1100 (9th Cir. 2007). "Among
7  them is the mandate that state plans provide for regular
8  revisions to reflect evolving air quality conditions and
9  standards." *Id.* The revisions need not completely recast
10 provisions of the SIP. *Id.* The CAA allows for the submission
11 and review of piecemeal amendments that deal "with discrete SIP
12 provisions, leaving most of the plan untouched." *Id.* The EPA
13 must determine that the SIP meets the requirements under the CAA
14 before the SIP becomes effective. *Id.; See also,* 42 U.S.C. §
15 7410(k)(3). "The EPA must also approve the plan amendments and
16 'shall not approve a revision of a plan if the revision would
17 interfere with any applicable requirement concerning attainment
18 and reasonable further progress or any other applicable
19 requirement of the CAA." *Id; See also,* 42 U.S.C. § 7410(l).
20 **C.   SB 700**

21     Former California Health & Safety Code § 42310(e) ("section
22 42310(e)") exempted "any equipment used in agricultural
23 operations in the growing of crops or the raising of fowl or
24 animals" from the obligation to obtain a permit. Cal. Health &
25 Safety Code § 42310(e) (2003). After EPA found that the
26 agricultural equipment exemption in section 42310(e) conflicted
27 with the Act's permitting requirements, 67 Fed. Reg. 35990 (May
28 22, 2002); 68 Fed. Reg. 37746 (June 23, 2003), the California

**5**

1  Legislature passed Senate Bill 700 ("SB 700"), which took effect
2  January 1, 2004, and removed the agricultural exemption from
3  Health & Safety Code § 42310(e). Cal. Health & Safety Code §
4  42310(b); SB 700 § 11, 2003-2004 Sess. (Cal. 2003).

5      Among other things, SB 700 required agricultural sources'
6  compliance with already-adopted rules and preserved the authority
7  of an air district to regulate agricultural sources pursuant to
8  rules adopted before January 1, 2003. SB 700 § 2, 2003-2004 Sess.
9  (Cal. 2003); Cal. Health & Safety Code § 39011.5. "[F]rom the
10 express language of the statute, § 39011.5 intended to make
11 District rules applicable to stationary agricultural sources and
12 did not intend to limit the authority of districts to comply with
13 [Clean Air Act] requirements." *Association of Irritated Residents*
14 *v. Fred Schakel Dairy*, No. 1:05:CV-00707-OWW-SMS (E.D. Cal. Dec.
15 2, 2005) (related case) (Order on Defendants' Motion to Dismiss,
16 at 18 (Docket # 36)).  However, SB 700 also contained §
17 42301.16(c) in its provisions.  This section created a narrower
18 exemption under state law to the requirement of obtaining an ATC
19 permit for non major stationary sources that emit below a 12.5
20 VOC ton/year threshold.

21 **D.   Correspondence From the District to C& R Vanderham Dairy**

22      On July 25, 2005 C&R Vanderham Dairy received a letter from
23 David Warner, Director of Permit Services at the District which
24 stated, "Pursuant to Senate Bill 700 and District Rule 2201...
25 all agricultural operations including confined animal feeding
26 operations that commenced construction after January 1, 2004 with
27 emissions greater than one half the major threshold levels (12.5
28 tons of VOC) are required to obtain an ATC permit."  The letter

**6**

proceeds to state that "the District has issued a draft report
which outlines a new emissions factor of 20.6 lbs/head/year based
on the latest studies and scientific papers.  This new report
indicates that emissions from dairies were very likely to have
been significantly underestimated."  The letter concludes that
"the District cannot condone the proposed construction activities
[of Vanderham dairy] until the emission factor issue is settled
on August 1, 2005 since permits may be required for the proposed
dairy.  If C&R Vanderham Dairy continues with the construction,
they proceed at their own risk."  (Doc. 141, Request for Judicial
Notice, Ex. 1, Filed July 23, 2007)

Mr. Warner then sent another letter on December 12, 2005
that stated, "based on all the information provided to the
District regarding [C&R Vanderham's] construction activities, the
determination was made that your dairy commenced construction
prior to the date that the District started requiring Authority
to Construct ("ATC") permits.  Your dairy is therefore considered
an existing operation and no ATC is required."  (Doc. 10,
Defendants Request for Judicial Notice, Filed February 14, 2006.)

However, the letter also states that "the emissions from
[the] dairy will exceed the new permitting levels, a permit to
operate is required for [the] dairy."  The letter proceeds to
state that Defendants submitted an application for an operating
permit on October 31, 2005 which served as a temporary permit to
Operate until the final permit was granted.

**E.    Allegations in the Complaint**

Plaintiffs assert three claims.  Plaintiffs allege that
Defendants violated the plain language of the EPA approved SIP

**7**

and its approved versions of District Rules 2010 and 2201.

Plaintiffs now seek summary adjudication of the following:

> 1.   Defendants failed to obtain an ATC permit
>
> 2.   Defendants failed to install BACT at emissions units that exceed thresholds and
>
> 3.   Defendants failed to purchase offsets when Vanderham exceeded thresholds

(Doc. 1, Complaint, Filed December 15, 2005.)

Rule 2010 states:

> "Any person building, altering, or replacing any operation, article, machine, or equipment... the use of which may cause the issuance of air contaminants... shall first obtain authorization for such construction from an Air Pollution Control Officer ("APCO").  An authority to construct shall remain in effect until the Permit to Operate the source operation for which the application was filed is granted or denied, or the application is canceled..."

(Doc.84-2, Kar Declaration, Rule 2010 - amended December 17, 1992, Filed April 6, 2007.)

Rule 2201 applies to "all new stationary sources and all modifications to existing stationary sources which are subject to the District permit requirements and after construction emit or may emit one or more affected pollutants."  District Rule 2201, § 2.0.  Section 3.25 defines a "major source" as the following:

> "For each pollutant, a Stationary Source with post-project emissions or a post-project Stationary Source Potential to Emit (SSPE2), equal to or exceeding one or more of the following threshold values

> Section 3.25.1 of Rule 2201 states:

> For determining major source, status, fugitives shall only be included for calculating the air pollutant post-project emissions or SSPE2 if the source is included in the list of source categories identified in the major source definition in 40 CFR Part 70.2, or when determining if a stationary source is a major air toxics source as defined in Rule 2520.

**8**

Table 3-2, Major Source Emissions Thresholds

| Pollutant | Threshold (Pounds Per Year) |
|-----------|------------------------------|
| VOC | 50,000 |
| NOx | 50,000 |
| CO | 200,000 |
| PM10 | 140,000 |
| SOx | 140,000 |

Lastly, Section 4.1 of Rule 2201 states that Best Available Control Technology ("BACT") requirements shall be triggered on a pollutant by pollutant basis and on an emissions unit-by emissions unit basis."  The rule further states that BACT shall be required for the following actions:

"4.1.1 Any new emissions unit or relocation from one Stationary Source to another of an existing emissions unit with a Potential to emit exceeding 2.0 pounds in any one day;

4.1.2 Modification to an existing emissions unit with a valid Permit to Operate resulting in an Adjusted Increase in Permitted Emissions (AIPE) EXCEEDING 2.0 pounds in any one day1;

4.1.3 Any new or modified emissions unit, in a stationary source project, which results in a Title I Modification as defined by in this rule.

An agricultural source is required to purchase offsets if post project Stationary Source Potential to Emit ("SSPE2") is above 20,000 pounds or 10 tons of VOC per year.  Rule 2201 § 4.5.

**F.   Timeline of Relevant Events**

| | |
|---|---|
| September 17, 1998 | San Joaquin Valley Unified Air Pollution Control District ("District") adopts Rule 2020 (Exemptions) that exempts "any equipment used in agricultural operations in the growing of crops or the raising of fowl or animals" from obtaining an authority to construct permit. 66 Fed. Reg. 37587, 37587 (July 19, 2001). |

9

| July 23, 1999 | EPA approves Rule 2010 (Permits Required) as part of the State Implementation Plan. 64 Fed. Reg. 39920 (July 23, 1999). |
|---|---|
| September 14, 1999 | Corrie Vanderham applies to Kern County for a conditional use permit for the C&R Vanderham Dairy. PSUF ¶ 33. |
| July 19, 2001 | The U.S. Environmental Protection Agency ("EPA") disapproves Rule 2020 because the exemption for agricultural equipment in Rule 2020 is inconsistent with the Clean Air Act. 66 Fed. Reg. 37587, 37589-90 (July 19, 2001). |
| December 19, 2002 | The District adopts an amended version of Rule 2020 that eliminates the agricultural equipment exemption. 68 Fed. Reg. 7330, 7335 (Feb. 13, 2003). |
| January 1, 2004 | EPA finds that California's State Implementation Plan is substantially inadequate and requires California to revise the State Implementation Plan by removing the agricultural equipment exemption in Cal. Health & Safety Code § 42310(e) (2003). 68 Fed. Reg. 37746 (June 25, 2003). |
| June 16, 2004 | Effective date of Senate Bill 700, which amended Cal. Health & Safety Code § 42310(e) to remove the agricultural equipment exemption. SB 700 § 11, 2003-2004 Sess. (Cal. 2003). |
| August 24, 2004 | Effective June 16, 2004, EPA approves the December 19, 2002 versions of Rule 2020 and 2201 (New and Modified Stationary Source Review) as part of the State Implementation Plan. 69 Fed. Reg. 27837 (May 17, 2004). |
| April 29, 2005 | Ag Resources, LLC enters into "Site Improvement Construction Agreement" to build a freestall dairy "for C&R Vanderham Dairy" at current site. Ag Resources owned the site at the time. PSUF ¶ 25. |
| July 15, 2005 | Letter from Defendants' counsel to the District stating that C&R Vanderham Dairy is developing a dairy project, that the dairy will produce 12.4 tons of VOC per year, and is under construction. PSUF ¶ 29. |
| July 29, 2005 | Vanderham obtains building permits for milking barn, freestall structures, shade structures, hoof trimming shade, hay barn structures, and commodity barn. PSUF ¶ 35. |

| September 20, 2005 | AIR mails 60-day notice of intent to sue to Rick Vanderham, Corrie Vanderham, and C&R Vanderham Dairy. PSUF ¶ 17. |
|---|---|
| October 28, 2005 | Rick Vanderham files application with District for Permit to Operate to be issued to C&R Vanderham Dairy. PSUF ¶ 26. |
| December 15, 2005 | AIR files Complaint (Docket # 1). |
| February 2, 2006 | Corrie Vanderham Dairy, Inc. enters into agreement to purchase C&R Vanderham Dairy property from Ag Resources, LLC. PSUF ¶ 23. |
| February 14, 2006 | Vanderham files motion to dismiss for lack of subject matter jurisdiction for failure to exhaust administrative remedies (Docket # 11). |
| June 15, 2006 | Court denies Vanderham's motion to dismiss for lack of subject matter jurisdiction for failure to exhaust administrative remedies (Docket # 36). |
| July 7, 2006 | Vanderham files motion to dismiss for failure to state a claim upon which relief can be granted (Docket # 37). |
| July 10, 2006 | AIR mails 60-day notice of intent to sue to Corrie Vanderham Dairy, Inc. PSUF ¶ 18. |
| August 29, 2006 | AIR mails 60-day notice of intent to sue to Corrie Vanderham Dairy, Inc., and Ag Resources, LLC. PSUF ¶ 19. |
| September 13, 2006 | Court denies Vanderham's motion to dismiss for failure to state a claim upon which relief can be granted (Docket # 50). |
| October 31, 2006 | AIR files First Amended Complaint (Docket # 58). |

**G.   Undisputed Facts**

   **i.   San Joaquin Valley Air Basin**

   The EPA designated the San Joaquin Valley a serious nonattainment area for the federal eight-hour ozone standard. (PSUF No. 5.)

   The San Joaquin Valley Air Basin includes all of San Joaquin, Stanislaus, Merced, Madera, Fresno, Kings, Tulare, and

the Valley portions of Kern County, as defined by District Rule ("Rule")1020 § 3.44.  (PSUF No. 6.)

### ii.  Health Effects of VOC

VOCs react with oxides of nitrogen ("NOx") in the presence of heat and sunlight to form ground-level ozone.  (PSUF No. 1.)

A document prepared jointly by the California Air Resources Board and the American Lung Association states that ozone pollution damages lung tissue, damages crops and vegetation, exacerbates asthma, reduces lung capacity, increases respiratory and cardiovascular hospital admissions, and increases school and work absenteeism. It also states that recent research suggests a causal connection between ozone pollution and asthma.  (PSUF No. 3.)

EPA statements confirm that ozone damages lung tissue, reduces lung function, exacerbates respiratory ailments such as asthma, increases hospital admissions, reduces productivity, and is a significant health concern, particularly for children and people with respiratory ailments.  (PSUF No. 4.)

### iii. District Rules

Vanderham admits that the District rules, including Rules 2010 and 2201, are "emission standards or limitations" as defined by 42 U.S.C. §§ 7604(f), 7604(k), which define an "emission standard or limitation" to include any standard or limitation approved as part of the State Implementation Plan ("SIP").  (PSUF No. 8.)

Vanderham did not obtain an Authority to Construct ("ATC") permit from the District.  (PSUF No. 36.)

In August 2005, the District established a VOC emission

**12**

1  factor for dairies of 19.3 pounds per cow per year.  (PSUF No.
2  49.)

3      The District is responsible for determining what Best
4  Available Control Technology ("BACT") is on a case by case basis.
5  (PSUF No. 50.)

6      The District has not undertaken a BACT analysis for the C&R
7  Vanderham Dairy.  (PSUF No. 52.)

8      **iv.  AIR**

9      AIR is an unincorporated association that advocates for
10  clean air and environmental health in the San Joaquin Valley.
11  (PSUF No. 10.)

12      On September 20, 2005, AIR mailed a 60-day notice of intent
13  to sue to Rick Vanderham, Corrie Vanderham, and C&R Vanderham
14  Dairy for failure to comply with Rules 2010 and 2201.  (PSUF No.
15  17.)

16      On July 10, 2006, AIR mailed a 60-day notice of intent to
17  sue to Corrie Vanderham Dairy, Inc.  (PSUF No. 18.)

18      **iv.  Vanderham Dairy**

19      The C&R Vanderham Dairy emits VOC from manure decomposition,
20  enteric processes (cow digestion), and feed decomposition. (PSUF
21  No. 2.)

22      The C&R Vanderham Dairy is located near Shafter in the
23  Valley portion of Kern County.  (PSUF No. 7.)

24      EPA approved the December 17, 1992 version of Rule 2010 and
25  the December 19, 2002 version of Rule 2201 as part of the SIP.
26  (PSUF No. 9.)

27      C&R Vanderham Dairy is a general partnership between Corrie
28  Vanderham Dairy,Inc., and Rick Vanderham.  (PSUF No. 11.)

**13**

1    Corrie Vanderham Dairy, Inc. is a California corporation.

2    (PSUF No. 12.)

3    Ag Resources, LLC is a California limited liability company.

4    (PSUF No. 13.)

5    Rick Vanderham is an individual within the meaning of the

6    Clean Air Act.  (PSUF No. 14.)

7    Corrie Vanderham is an individual within the meaning of the

8    Clean Air Act.  (PSUF No. 15.)

9    The Vanderham defendants are persons within the meaning of

10   the Clean Air Act.  (PSUF No. 16.)

11   On August 29, 2006, AIR mailed a 60-day notice of intent to

12   sue to Corrie Vanderham Dairy, Inc., and Ag Resources, LLC.

13   (PSUF No.19. )

14   Corrie Vanderham is the president of Corrie Vanderham Dairy,

15   Inc.  (PSUF No. 20.)

16   The C&R Vanderham Dairy partnership operates the dairy.

17   (PSUF No. 21.)

18   Corrie Vanderham Dairy, Inc., owns the C&R Vanderham Dairy

19   infrastructure and property, and leases them to the C&R Vanderham

20   Dairy partnership.  (PSUF No. 22.)

21   Corrie Vanderham Dairy, Inc. purchased the C&R Vanderham

22   Dairy property from Ag Resources, LLC on February 2, 2006.  (PSUF

23   No. 23.)

24   Ag Resources, LLC, purchased the property from John

25   Ohanesson on April 15, 2003.  (PSUF No. 24.)

26   On April 29, 2005, Ag Resources, LLC entered into a "Site

27   Improvement Construction Agreement" with Vander Weerd General

28   Construction, Inc. to build a freestall dairy "for C&R Vanderham

**14**

1  Dairy" at the site at which the C&R Vanderham Dairy has been
2  constructed and which Ag Resources owned at the time.  (PSUF No.
3  25.)

4      On October 28, 2005, Vanderham applied for a Permit to
5  Operate for the C&R Vanderham Dairy, and identified the milking
6  barn, cow housing, solid manure handling, and liquid manure
7  management as "equipment" for which it sought a permit to
8  operate.  (PSUF No. 26.)

9      The Application for Permit to Operate also lists "land
10 application" in the waste handling category of operations and
11 equipment and identifies "feed storage/commodity barns" and
12 "silage piles" as "other dairy equipment."  (PSUF No. 27.)

13     Rick Vanderham signed the Application for the Permit to
14 Operate as the applicant.  (PSUF No. 28.)

15     In a July 15, 2005 letter to Mr. Sheraz Gill at the
16 District, Vanderham's counsel David Albers represented to the
17 District that his law firm "represent[s] C & R Vanderham Dairy,
18 which is developing a new dairy project."

19     The letter stated that the project would be built for 1320
20 milk cows, 195 heifers, 486 heifers over 15 months, 378 heifers
21 aged 7 to 14 months, 162 heifers 4 to 6 months, and 120 calves.
22 *Id.*  According to the letter, which used a worksheet downloaded
23 from the District website, the dairy would produce 24,861.9
24 pounds or 12.4 tons per year of VOC.  The worksheet attached to
25 the letter used an emission factor of 12.8 pounds per head per
26 year for milk cows.  The letter indicated that the dairy was
27 under construction.  (PSUF No. 29.)

28     Rick Vanderham, one of the defendants, wrote a letter to the

**15**

District on C&R Vanderham Dairy letterhead, in which he represented to the District that "we will take certain steps . . . to construct the dairy for the cattle listed in this letter." (PSUF No. 30.)

In a letter dated December 8, 2005, Mr. Albers, on behalf of "our client Rick Vanderham," represented to the District that "the Vanderhams have agreed to construct permanent barriers . . . to limit the dairy herd size." (PSUF No. 31.)

The December 8 letter identifies that copies were sent to defendants Rick Vanderham and Corrie Vanderham. (PSUF No. 32.)

A 1999 Conditional Use Permit application from the Kern County Planning Department for the defendant C&R Vanderham Dairy identifies John Ohanneson as the property owner, defendant Corrie Vanderham as the applicant, and defendant Richard Vanderham as the applicant's individual representative. (PSUF No. 33.)

On the Conditional Use Permit application, Corrie Vanderham's interest in the property is identified as "Buyer" and under the "reason for request" section, Corrie Vanderham indicates, "I would like to build a dairy on this property" above his signature. (PSUF No. 34.)

On July 29, 2005, Vanderham obtained building permits for a milk barn, two freestall barns, and two hay barns, shade structures, a hoof trimming shade, and a commodity barn at the dairy site. (PSUF No. 35.)

A construction timeline submitted with Vanderham's first motion to dismiss states that construction commenced on July 18, 2005. (PSUF No. 37.)

Vanderham has constructed, or is in the process of

**16**

constructing, a milk barn, two freestall barns, two solid
separation lagoons, two liquid manure storage lagoons, corrals,
and the feed storage area.  (PSUF No. 38.)

    The C&R Vanderham dairy facility contains two "freestall
barns," that will confine the milk cow herd.  Each barn is 500
feet long and 107 feet wide and equipped with a system that uses
wastewater from the liquid manure storage lagoons to "flush" the
manure from the freestall barns twice a day. The flush system
captures 80% or more of the urine and feces of the cows housed in
the freestall barns and flushes the waste to the solid separation
lagoons and the liquid manure storage lagoons.  (PSUF No. 39.)

    The corrals and milk barn also utilize a flush system,
except that the milk barn system uses fresh water to flush the
manure to the liquid manure storage lagoon.  (PSUF No. 40.)

    The two liquid manure storage lagoons each measure 110 feet
wide and 860 feet long, together storing 108 acre-feet of
liquified waste to be used for dairy flushings and to irrigate
and fertilize crops on 362 acres of the project site.  (PSUF No.
41.)

    The C&R Vanderham Dairy also contains several solid
separation lagoons, which are used to remove a portion of manure
solids from the liquified manure.  (PSUF No.42. )

    The C&R Vanderham Dairy is a stationary source of air
pollution, within the meaning of the Clean Air Act and Rule 2201.
(PSUF No. 43.)  It is undisputed that C&R Vanderham Dairy are a
non major stationary source.

    Dairy farms have a specific standard industrial
classification ("SIC") designation (0241), and all activities

**17**

1 associated with a dairy fall under SIC code major group "02"
2 which covers "agriculture production livestock." (PSUF No. 44.)

3     Vanderham admits that the cow housing and feeding areas, the
4 milking center, the liquid manure handling area, the solid manure
5 handling area, and the land application area are emissions units
6 as defined by § 3.18 of Rule 2201. (PSUF No. 45.)

7     The District also recognizes the areas listed in ¶ 45 as
8 emissions units at a dairy. (PSUF No. 46.)

9     The C&R Vanderham Dairy, as designed, includes the following
10 components – each of which will hold cows, manure, or feed –
11 located on one or more contiguous or adjacent properties:
12 freestall barns, corrals with flushed lanes, and feed storage
13 facilities (cow housing and feeding area), solid separation
14 lagoons and liquid manure storage lagoons (liquid manure handling
15 area), and milk barn (milking center). (PSUF No. 47.)

16     The C&R Vanderham Dairy will compost manure onsite (solid
17 manure handling area) and apply liquid and solid manure to land
18 at the dairy site (land application area), each of which will
19 involve manure. (PSUF No. 48.)

20     On August 24, 2004, Kern County approved the Conditional Use
21 Permit for C&R Vanderham Dairy, authorizing a maximum of 1,456
22 milk cows and 1,408 "support stock" (non-lactating or dry cows,
23 heifers, and calves). (PSUF No. 53.)

24     Defendants Rick Vanderham, Corrie Vanderham, and C&R
25 Vanderham Dairy claim that the "maximum operational design for
26 physical construction of the dairy is as follows":

27     1,320 milk cows, 195 dry cows, 540 cows aged 15-25
28     months, 378 cows aged 7-14 months, 162 cows aged 4-6

**18**

1  months, and 120 calves aged under 3 months.
2  (PSUF No. 54.)

3      Blueprints for the C&R Vanderham Dairy show a maximum
4  operational capacity at the dairy, as follows: either 1,568 milk
5  cows (overall site plan) or 1,624 milk cows (individual freestall
6  barn site plans), 280 dry cows, 470 cows aged 15-24 months, 348
7  cows aged 7-14 months, 84 cows aged 5-7 months, and 150 calves.
8  (PSUF No. 55.)

9      Vanderham has not purchased "emission reduction credits" or
10  "offsets" for VOC. (PSUF No. 64.)

11     On December 7, 2005, the Air District notified Vanderham
12  that it had completed review of the Permit to Operate, but would
13  not issue the Permit to Operate until the completion of
14  construction and a District inspection of the dairy. (PSUF No.
15  65.)

16     On April 3, 2007, the District issued the Permit to Operate.
17  (PSUF No. 66.)

18  **H.   Disputed Facts**

19     Plaintiffs argue that the District does not use the document
20  "Preliminary Draft, Best Available Control Technology, Dairy
21  Operation," dated April 27, 2004 to determine BACT for New Source
22  Review. (DSDF, No. 51.)

23     Defendants argue that while the District does not use the
24  "Preliminary Draft" for guidance, it is updated by the District
25  and may be used for non-guidance purposes.

26     Also, according to Plaintiffs, the C&R Vanderham Dairy will
27  house the milk cows in the freestall barns and the support stock
28  in corrals. (DSDF, No. 56.) Defendants dispute this by arguing

**19**

1    that some support stock are housed in free stall barns as well.

2        Defendants also dispute that, dairies emit VOC from each of

3    the emissions units at different rates based on the age of the

4    cow and the type of housing (freestall barns for milk cows and

5    corrals for support stock), as follows:

6

**Emissions Factor by Type of Cow (age) (lbs/hd/year)**

| Emissions Unit | Milk cows | Dry Cows | 14-24 mths | 7-14 mths | 4-6 mths | >3 mnths |
|---|---|---|---|---|---|---|
| Cow Housing and Feed | 12.4 | 8.2 | 5.7 | 4.9 | 4.5 | 4.3 |
| Milking Center | 0.9 | N/A | N/A | N/A | N/A | N/A |
| Liquid Manure Handling | 2.7 | 1.4 | 1.0 | 0.9 | 0.8 | 0.7 |
| Land Application | 5.0 | 2.3 | 1.6 | 1.4 | 1.3 | 1.2 |
| **Total** | 21.0 | 11.9 | 8.3 | 72 | 6.6 | 6.2 |

(DSDF, No. 57.)

19        The Potential to Emit for VOC from the cow housing and

20   feeding emissions unit exceeds 2 pounds a day; the Potential to

21   Emit is 76.3 lbs/day based on the maximum capacity shown by the

22   blueprints for the C&R Vanderham Dairy and 65.2 lbs/day based on

23   the maximum capacity provided by Vanderham.  (DSDF, No. 58.)

24        The Potential to Emit for VOC from the milking center

25   emissions unit exceeds 2 pounds a day; the Potential to Emit is

26   4.0 lbs/day based on the maximum capacity shown by the blueprints

27   for the C&R Vanderham Dairy and 3.3 lbs/day based on the maximum

28   capacity provided by Vanderham.  (DSDF, No. 59.)

1    The Potential to Emit for VOC from the liquid manure
2    handling emissions unit exceeds 2 pounds a day; the Potential to
3    Emit is 15.7 lbs/day based on the maximum capacity shown by the
4    blueprints for the C&R Vanderham Dairy and to 13.3 lbs/day based
5    on the maximum capacity provided by Vanderham. (DSDF, No. 60.)

6    The Potential to Emit for VOC from the land application
7    emissions unit exceeds 2 pounds a day; the Potential to Emit is
8    28.2 lbs/day based on the maximum capacity shown by the
9    blueprints for the C&R Vanderham Dairy and to 23.8 lbs/day based
10   on the maximum capacity provided by Vanderham. (DSDF, No. 61.)

11   The C&R Vanderham Dairy operation's post-project Stationary
12   Source Potential to Emit VOC exceeds ten tons per year; Vanderham
13   calculates the "total annual emissions" at the C&R Vanderham
14   Dairy as 24,861.9 pounds or 12.4 tons of VOC per year, based on
15   an outdated emission factor of 12.8 tons of VOC per head per
16   year. (DSDF, No. 62.)

17   The C&R Vanderham Dairy's post-project Stationary Source
18   Potential to Emit VOC equals 22.6 tons per year based on the
19   maximum capacity shown by the blueprints for the C&R Vanderham
20   Dairy and 19.2 tons per year based on the maximum capacity
21   provided by Vanderham. (DSDF, No. 63.)

22   Defendant dispute facts Nos. 58-63 arguing that there is no
23   basis for the "blueprint" capacity. However, Defendants offer no
24   alternative calculations or any other contrary evidence.
25   Defendants merely argue that they could not have possibly been
26   required to install BACT since the BACT determination process is
27   so closely tied to the ATC permitting process. Defendants also
28   argue that District Rule 4.6.9 exempts agricultural sources from

**21**

the requirement to purchase offsets.

## 4. REQUESTS FOR JUDICIAL NOTICE

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (1984). "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d) (1984). Judicially noticed facts often consist of matters of public record, such as prior court proceedings, see, e.g., Emrich v. Touche Ross & Co., 846 F.2d 1190, 1198 (9th Cir. 1988); administrative materials, see, e.g., Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994); city ordinances, see, e.g., Toney v. Burris, 829 F.2d 622, 626-27 (7th Cir. 1987) (holding that federal courts may take judicial notice of city ordinances); official maps, see, e.g., Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 86 n.8 (E.D.N.Y. 2001) (taking judicial notice of geological surveys and existing land use maps); or other court documents, see, e.g., Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a filed complaint as a public record). Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992).

Defendants request judicial notice of the following

documents:

1. *Finding of Substantial Inadequacy of Implementation Plan; Call for California State Implementation Plan Revision*, Proposed Rule, 68 Fed. Reg. 7327 (February 13, 2003). (Doc. 112, Defendants' Request for Judicial Notice, Ex. A, Filed May 29, 2007; *See also,* Doc. 126, Defendants' Request for Judicial Notice, Ex B, Filed June 15, 2007.)

2. *Finding of Substantial Inadequacy of Implementation Plan; Call for California State Implementation Plan Revision, Final Rule*, 68 Fed. Reg. 37746 (June 25, 2003). (*Id.* at Ex. B; *See also,* Doc. 126 at Ex D.)

3. *Revisions to the California State Implementation Plan, San Joaquin Valley Unified Air Pollution Control District*, Proposed Rule, 68 Fed. Reg. 7330 (February 13, 2003). (*Id.* at Ex. C; *See also,* Doc. 126 at Ex C.)

4. *Revisions to the California State Implementation Plan; San Joaquin Valley Unified Air Pollution Control District*, Final Rule, 69 Fed. Reg. 27837 (May 17, 2004), a true and correct copy of which is attached hereto as Exhibit "D." (*Id.* at Ex. D; *See also,* Doc. 126 at Ex E.)

5. San Joaquin Valley Unified Air Pollution Control District, Final Draft Staff Report: Rules 2020 and 2201 (August 17, 2006). (*Id.* at Ex. E.)

6. Letter for the California Air Resources Board ("CARB") to Brent Newell dated May 30, 2007, available at http://www.arb.ca.gov/nsr/sb288/sb288ltr1.pdf. (Doc. 150, Defendants' Request for Judicial Notice, Ex. A, Filed July 30 2007.)

7. *Notice of Deficiency for 34 Clean Air Act Operating Permit Programs in California*, 67 Fed. Reg. 35990 (May 22, 2002). (Doc. 126 at Ex A.)

8. A verified complaint filed by plaintiff Association of Irritated Residents ("Plaintiff") on or about June 18, 2004 in the action entitled *Western United Dairymen, et al. v. San Joaquin Valley Unified Air Pollution Control District*, et al., Superior Court of the State of California in and For the County of Fresno, Case No. 04 CE CG 01596 (the "State Action"). (Doc. 126 at Ex F.)

9. A Memorandum of Points and Authorities in

23

1        Opposition to Order to Show Cause Re: Preliminary
         Injunction and Stay filed by Plaintiff on or about
2        June 18, 2004 in the State Action.  (Doc. 126 at
         Ex G.)

3

4   10.  San Joaquin Valley Unified Air Pollution Control
         District, Final Draft Staff Report: Amendments to
         Rule 2020 (Exemptions) and 2201 (August 17, 2006).
5        (Doc. 126 at Ex H.)

6   11.  Letter from the California Air Resources Board to
         the United States EPA dated November 5, 2004
7        available at
         www.arb.ca.gov/fcaa/tv/tvinfo/overview.htm.  (Doc.
8        126 at Ex I.)

9   12.  Opinion letter from the State of California Office
         of the Attorney General to the United States
10       Environmental Protection Agency dated November 3,
         2003, available at
11       www.arb.ca.gov/fcaa/tv/tvinfo/overview.htm.  (Doc.
         126 at Ex J.)
12

13   13.  San Joaquin Valley Unified Air Pollution Control
         District Rule 2010.  (Doc. 126 at Ex K.)

14   14.  San Joaquin Valley Unified Air Pollution Control
         District Rule 2201.  (Doc. 126 at Ex H.)
15

16   Plaintiffs request judicial notice of the following records:

17   1.   Exhibit 19 is a document entitled "Ground-level
         Ozone: Basic Information,"  The attached document
         is also posted on the United States Environmental
18        Protection Agency's web-site at
         http://www.epa.gov/air/ozonepollution/basic.html,
19        last updated March 6, 2007.  (Doc. 86, Plaintiffs'
         Request for Judicial Notice, Filed April 6, 2007.)
20

21   2.   Exhibit 20 is a document entitled "Ground-level
         Ozone: Health and Environment,"  The attached
         document is also posted on the United States
22        Environmental Protection Agency's web-site at
         http://www.epa.gov/air/ozonepollution/health.html,
23        last updated March 6, 2007.  (*Id.*)

24   3.   Exhibit 21 is a document entitled "Major Group 02:
         Agriculture production livestock and animal
25        specialties."  The attached document is also
         posted posted on the United States Environmental
26        Protection Agency's web-site at
         http://www.osha.gov/pls/imis/sic_manual.display?id
27        =2&tab=group , last visited Feb. 20, 2006.  (*Id.*)

28   4.   Exhibit 28 is a letter on Air District letterhead

notifying Defendants C&R Vanderham Dairy, *et al.*
("Vanderham") that the Permit to Operate will be
issued on or after December 7, 2005 after
Vanderham completes construction and the District
conducts an inspection of the dairy facility.
(Doc. 87, Plaintiffs' Request for Judicial Notice,
Filed April 6, 2007.)

5.   Exhibit 29 is a document entitled "Permit to
Operate," issued on April 3, 2007. (*Id.*)

Plaintiffs also seek judicial notice of a letter dated July
25, 2005 on Air District letterhead notifying Defendants that due
to an imminent change in the emissions factor, Defendants
proceeded in their planned construction "at their own risk."
(Doc. 146, Plaintiffs Request for Judicial Notice, Filed July 26,
2006.)

There are no objections by either party to the requests for
judicial notice.  The records are undisputed matters of public
record.  All letters transmitted by a government agency on agency
letterhead are self authenticating pursuant to Fed. R. Ev.
902(8).  However, the contents of these exhibits may contain
matters subject to dispute.  A disputed fact is not the proper
subject of judicial notice.  The judicial notice taken here is of
the existence of these documents and the fact that the documents
contain the contents represented, not necessarily that opinions
and information published are true.

Plaintiffs' request for Judicial Notice is **GRANTED IN PART.**

**5.   APPLICATION TO FILE AMICUS BRIEF BY MILK PRODUCERS COUNCIL**

Late in the evening of Friday, May 18, 2007, Milk Producers
Council filed an untimely Application for leave to file an Amicus
Curiae Brief on behalf of Defendants.  The initial hearing on
Plaintiffs' motion for summary judgment was held on Monday, May

21, 2007.  The application was filed after the close of business and did not give the parties the minimal due process opportunity to respond in any meaningful way to the issues raised in the Application.  Further, the untimeliness of the application did not provide the court with sufficient time to address the request.

Milk Producer Council's application to file an Amicus Curiae Brief is **DENIED WITHOUT PREJUDICE.**

## 6.  DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56©; *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id.*  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law."  *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations

**26**

1  without any significant probative evidence tending to support the
2  complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.
3  2001).

4              [T]he plain language of Rule 56(c) mandates the
5              entry of summary judgment, after adequate time
6              for discovery and upon motion, against a party
7              who fails to make a showing sufficient to
8              establish the existence of an element essential
9              to the party's case, and on which that party
10             will bear the burden of proof at trial.  In such
11             a situation, there can be "no genuine issue as
12             to any material fact," since a complete failure
13             of proof concerning an essential element of the
14             nonmoving party's case necessarily renders all
15             other facts immaterial.
16  *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more
17  implausible the claim or defense asserted by the nonmoving party,
18  the more persuasive its evidence must be to avoid summary
19  judgment.  *See United States ex rel.  Anderson v. N. Telecom,*
20  *Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the
21  evidence must be viewed in a light most favorable to the
22  nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on
23  summary judgment is not to weigh evidence or resolve issues;
24  rather, it is to determine whether there is a genuine issue for
25  trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th
26  Cir. 1996).
27  **B.   AIR Has Standing to Bring This Case**
28        The Association of Irritated Residents has standing to

**27**

prosecute Vanderham's violations of the SIP.  These violations directly affect AIR members' health, aesthetic, and procedural interests. Organizations have standing to bring an action on behalf of their members if (1) neither the claim asserted nor the relief requested requires their members to participate directly in the lawsuit, (2) they seek to protect interests that are germane to their purpose, and (3) their members would have standing to sue individually. *See United States v. San Francisco*, 979 F.2d 169, 171 (9th Cir. 1992).

### i.   AIR Members Need Not Participate Directly in the Lawsuit

Direct participation of any of AIR's members is unnecessary because AIR may bring this action.  The Clean Air Act allows any "person" to bring an action to enforce an emission standard or limitation.  42 U.S.C. § 7604(a)(1).  The Act defines "person" to include individuals, corporations, partnerships, and associations.  42 U.S.C. § 7602(e).  AIR is an unincorporated association.  Declaration of Tom Frantz ("Frantz Dec.") ¶ 2. Thus, AIR may bring this action without the direct participation of its members.

### ii.   AIR Seeks to Protect Interests Germane to its Purpose

AIR's mission is to advocate for clean air and environmental health in the San Joaquin Valley. Frantz Dec. ¶ 3.  The interests of clean air and environmental health that AIR seeks to protect using this citizen suit fall squarely within its mission.

### iii. AIR's Members Have Standing to Sue Individually

Finally, AIR members have standing to bring this suit individually.  To satisfy the final prong of the test, an

28

1  organization must show that (1) at least one of its members has

2  suffered an injury in fact, (2) the injury is fairly traceable to

3  Vanderham's illegal conduct, and (3) it is likely, as opposed to

4  merely speculative, that the injury will be redressed by a

5  favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

6  *Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  AIR member and

7  President of its Board of Directors, Tom Frantz, offers a

8  standing declaration here, to establish the injury in fact prong

9  of standing because he suffers physical, aesthetic, and

10 procedural harm.  Vanderham's illegal conduct caused this harm,

11 which a favorable decision from the Court will redress.

12                  **a.   AIR Members Suffer Injury in Fact**

13       Physical, aesthetic, and procedural harms all satisfy the

14 injury in fact requirement.  The Ninth Circuit has held that a

15 plaintiff "will suffer injury if compelled to breathe air less

16 pure than that mandated by the Clean Air Act."  *See, Hall v.*

17 *Norton*, 266 F.3d 969, 976 (9th Cir. 2001)("evidence of a credible

18 threat to the plaintiff's physical well being from airborne

19 pollutants" establishes injury in fact); *See also, Natural*

20 *Resources Defense Council v. EPA*, 507 F.2d 905, 910 (9th Cir.

21 1974).  Frantz resides in the San Joaquin Valley air basin, which

22 EPA has designated nonattainment for the eight-hour ozone

23 standard.  PSUF ¶ 5; Frantz Dec. ¶ 6.  The C&R Vanderham Dairy

24 emits VOC in the San Joaquin Valley air basin.  PSUF ¶¶ 2, 6, 7.

25 VOC reacts with oxides of nitrogen emissions to form ozone.  PSUF

26 ¶ 1.  Ozone has substantial adverse health effects.  PSUF ¶¶ 3,

27 4.  Frantz's home for the last 16 years lies 2.3 miles west of

28 the dairy.  Frantz Dec. ¶ 5.  Frantz breathes air that contains

                                 **29**

1  ozone, which harms him.   PSUF ¶¶ 3, 4; Frantz Dec. ¶ 6. For

2  instance, Frantz suffers from breathing difficulties which are

3  exacerbated by ozone pollution.   Frantz Dec. ¶ 6.   Ozone

4  pollution causes Frantz to be concerned about his health, his

5  family's health, and the health of his friends and students, many

6  of whom also live near the C&R Vanderham Dairy. Frantz Dec. ¶¶ 5,

7  6.

8      Further, aesthetic harm establishes injury in fact. *Laidlaw*,

9  528 U.S. at 183; *Environmental Rights Foundation v. Pacific*

10 *Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).   Ozone pollution

11 harms Frantz's aesthetic interest because on most summer days,

12 ozone haze obscures the view of the Sierra Nevada, Coastal Range,

13 and Sierra Madre mountains from his home in Shafter.   Frantz Dec.

14 ¶ 7.  Frantz has enjoyed the view of these mountains since

15 childhood.  *Id.*  On the extremely infrequent clear days, Frantz

16 enjoys the beauty of the San Joaquin Valley and the surrounding

17 mountains.  *Id.*   Vanderham's failure to obtain a preconstruction

18 permit has also deprived AIR members, including Frantz, of

19 procedural rights, which provide an independent basis for

20 standing.  *Massachusetts v. EPA*, 127 S. Ct. 1438, 1453 (2007),

21 *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7

22 (1992).  The "injury in fact requirements are adjusted for

23 plaintiffs raising procedural issues in that although they must

24 show a 'concrete interest' at stake, they need not show that the

25 substantive environmental harm is imminent." *Covington v.*

26 *Jefferson County*, 358 F.3d 626, 641 n.21 (9th Cir. 2004).

27 Vanderham has failed to obtain a required permit before

28 constructing the C&R Vanderham Dairy.  *See* Section VI, *infra.*

**30**

1   The evasion of these requirements constitutes a procedural injury

2   to Frantz, as it removes safeguards specifically designed to

3   ensure that environmental consequences are properly considered.

4   *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 931 (9th Cir.

5   1988) (procedural harm where construction on project proceeded

6   without a required permit).  Moreover, Rule 2201 requires that

7   the District provide the public with notice and opportunity to

8   comment on tentative permitting decisions for projects like the

9   C&R Vanderham Dairy which have a post-project Stationary Source

10  Potential to Emit that exceeds 10 tons per year.  Rule 2201 §§

11  5.4, 5.5; *see* Section IX, *infra*. Frantz would have participated

12  in the permitting decision, and has been deprived of the

13  procedural rights to receive notice, provide comment, and

14  otherwise participate in the District's decision to permit the

15  C&R Vanderham Dairy by Vanderham's failure to obtain a permit.

16  Frantz Dec. ¶ 8.  Because the Frantz Declaration establishes a

17  concrete interest at stake – air quality that contains unhealthy

18  levels of ozone – these procedural failures also establish injury

19  in fact.

20              **b.    The AIR Member's Injury in Fact is Traceable to
                        Vanderham's Illegal Conduct**

21

22          These physical, aesthetic, and procedural harms to a member

23  of the plaintiff organization are traceable to Vanderham's

24  illegal conduct.  Vanderham's dairy releases VOC into the San

25  Joaquin Valley air basin.  PSUF ¶¶ 2, 6, 7.  The VOC reacts with

26  nitrogen oxides to form ozone.  PSUF ¶ 1.  Ozone levels in the

27  air basin exceed the federal health-based 8-hour ozone NAAQS and

28  cause adverse health and aesthetic injuries. PSUF ¶¶ 3, 4; Frantz

**31**

1   Dec. ¶¶ 6, 7.  Thus, Frantz's injuries are traceable to

2   Vanderham's failure to obtain a preconstruction permit and

3   failure to comply with pollution control requirements.

4              **c.   Injunctive Relief and Civil Penalties Will Redress**
                **the AIR Member's Injury in Fact**

5        Finally, a favorable order by this Court will redress the

6   members' injuries from Vanderham's violations of the Clean Air

7   Act.  An order that compels Vanderham to obtain a permit, to

8   reduce the dairy's air pollution by installing BACT, and to buy

9   offsets will ensure a net reduction of VOC in the Valley.  An

10  order requiring Vanderham to obtain a permit will also redress

11  Frantz's procedural injury.  An order that imposes civil

12  penalties will deprive Vanderham of the benefit of its violations

13  and deter future violations of the Clean Air Act, also redressing

14  Frantz's injuries.  *Covington*, 358 F.3d at 641, *citing Laidlaw*,

15  528 U.S. at 185-86.  ("Redressability is satisfied . . . by the

16  fines and penalties applicable for violations of [the Clean Air

17  Act]").  Because Frantz has injuries in fact traceable to

18  Vanderham's redressable illegal conduct, he has standing to sue.

19  The organizational plaintiff, AIR, thus meets all three *Hunt*

20  criteria, and has standing.

21  **C.   District Rule 2010 Governs the Permit Requirements for**
       **Agricultural Source with the Force and Effect of Federal Law**

22       The first issue is the legal question of whether the Cal.

23  Health and Saf. Code § 42301.16(c)[1] exemption applies to

24  _____

25      [1]  Cal. Health & Saf. Code § 42301.16(c) provides:

26  "Prior to requiring a permit for an agricultural source of air
pollution with actual emissions that are less than one-half of
any applicable emissions threshold for a major source in the

**32**

1   agricultural sources in light of San Joaquin Valley Air Pollution
2   District's ("District") Rule 2010's incorporation in the
3   California SIP.[2]  There is no dispute that under state law
4   Defendants are a non major stationary source emitting less than
5   12.5 tons of VOC/year.  According § 42301.16(c), non major
6   stationary sources with less than a 12.5 VOC/year emission
7   threshold are exempt from obtaining an ATC permit.  Defendants
8   argue that the state law exemption applies to them because it was
9   enacted prior to the EPA's approval of the SIP, the EPA had
10  knowledge of the exemption, and the EPA expressly referenced SB
11  700 in promulgating documents it used to approve the SIP.
12  Defendants argue that they fall under the § 42301.16(c) exemption
13  because the dairy's actual emissions were 12.4 tons VOC per year,
14  which is less than the rule's threshold of 12.5 tons VOC per
15  year.

16

17  district, for any air contaminant, but excluding fugitive dust, a
18  district shall, in a public hearing, make all of the following
    findings:
19
20  (1)   The source is not subject to a permit requirement pursuant
          to Section 40724.6
21
22  (2)   A permit is necessary to impose or enforce reductions of
          emission of air pollutants that the district show cause or
          contribute to a violation of a state or federal ambient air
23        quality standard.
24  (3)   The requirement for a source or category of sources to
          obtain a permit would not impose a burden on those sources
          that is significantly more burdensome than permits required
25        for other similar sources of air pollution."

26        [2]  California's SIP includes December 17, 1992 version of
27  District Rule 2010, as well as the December 19, 2002 version of
    Rules 2201 and 2020 that are also at issue in this case. 64 Fed.
    Reg. 39920 (July 23, 1999); 69 Fed. Reg. 27837 (May 17, 2004); 40
28  C.F.R. § 52.220(c)(199)(i)(D); 40 C.F.R. § 52.220(c)(311)(i)(B).

1    Plaintiffs argue that under District Rule 2010, as

2    incorporated into the California SIP, any agricultural source

3    emitting air contaminants must obtain an ATC.  There is no

4    dispute that § 42301.16 was ever mentioned in the provisions of

5    the California SIP.  Plaintiffs argue, based on the plain

6    language of the SIP that the § 42301.16(c) exemption does not

7    apply to Defendants.  Based on the plain language of the

8    California SIP, Plaintiffs argue that District rule 2010[3] governs

9    the permitting the Vanderham Dairy.

### i.   The California SIP Which was Approved By the EPA Functions as Federal Law

An EPA-approved SIP is federal law and does not change
unless and until EPA approves a revision requested by a state.
*Safe Air*, 475 F.3d at 1105.  States are free to revise their EPA
approved SIPs, subject to certain Clean Air Act ("Act")
restrictions, but unless and until EPA approves a revision,
states are "relegated to a lone option: compliance." *El Comité
para el Bienestar de Earlimart v. Helliker*, 416 F. Supp. 2d 912,
934 (E.D. Cal. 2006) ("*El Comité*"), quoting *Friends of the Earth
v. Carey*, 535 F.2d 165, 178 (2nd Cir. 1976); *see also Sierra Club
v. TVA*, 430 F.3d 1337, 1346 (11th Cir. 2005) ("If a state wants
to add, delete, or otherwise modify any SIP provision, it must

---

[3]   Rule 2010 § 3.0 provides: "Any person building, altering,
or replacing any operation, article, machine, or equipment... the
use of which may cause the issuance of air contaminants... shall
first obtain authorization for such construction from an Air
Pollution Control Officer ("APCO").  An authority to construct
shall remain in effect until the Permit to Operate the source
operation for which the application was filed is granted or
denied, or the application is canceled..."

1  submit the proposed change to EPA for approval.").

2        Once "a SIP is adopted by a state and approved by the EPA,

3  it becomes controlling and must be carried out by the state" and

4  the SIP's "requirements and commitments become binding upon the

5  state as a matter of federal law." *AIR v. C&R Vanderham Dairy*,

6  435 F. Supp. 2d 1078, 1085 (E.D. Cal. 2006), citing *Bayview*

7  *Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d

8  692, 695 (9th Cir. 2004) and *Beentjes v. Placer County Air*

9  *Pollution Control Dist.*, 254 F. Supp. 2d 1159, 1162 (E.D. Cal.

10  2003). The Act "precludes the right of any state to 'adopt or

11  enforce any emission standard or limitation which is less

12  stringent than the standard or limitation' contained in an EPA

13  approved SIP." Order on Defs.' Mot. to Dismiss (Docket 50) at 18

14  (emphasis added), quoting *Kentucky Res. Council, Inc. v. EPA*, 304

15  F. Supp. 2d 920, 926 (W.D. Ky. 2004); *see Safe Air*, 475 F.3d at

16  1105; 42 U.S.C. § 7416 (expressly preempting state law less

17  stringent than an EPA-approved SIP). Where state and federal

18  laws conflict, the state law must yield, pursuant to the

19  Supremacy Clause. U.S. CONST. art. VI, cl. 2; *McCulloch v.*

20  *Maryland*, 17 U.S. 316, 436-437 (1819).

21        Defendants fail to address the law established in *Safe Air.*

22  Instead, Defendants first argue that the incorporation of rule

23  2020 in the SIP did not remove the agricultural exemption for

24  agricultural sources altogether. They argue that the exemption

25  still applies for sources whose actual emissions are less than

26  half of the major source threshold of 12.5 tons VOC/year.

27  Defendants assert, without any support in law that the EPA

28  approval of the SIP cannot require the district to ignore the

1   state exemption of § 42301.16(c) "because the EPA states in the

2   SIP approval that the states give the district authority to carry

3   out the provisions of the SIP."  (Doc. 113, Supplemental Brief in

4   Opposition to Summary Judgment, Filed May 30, 2007.)  This

5   language does not grant the states complete autonomy to determine

6   CAA regulations without regard to federal law.  The states'

7   authority is still subject to the conditions outlined by the

8   State SIP.  While the State of California is free to revise the

9   EPA approved SIP, the revisions must be approved by the EPA.

10  Until there is approval of the revisions, California is relegated

11  to compliance.

12      Defendants provide no evidence that the § 42301.16(c)

13  exemption was ever expressly approved by the EPA.  Defendants

14  instead argue that because the EPA approved the SIP after

15  §42901.16 was enacted and because the SIP references SB 700,

16  which included § 42901.16, the EPA must have approved the SIP

17  subject to the exemption.  However, at the August 13, 2007

18  hearing on the supplemental briefs to this motion, Defendants

19  revealed that § 42301.16(c) is currently pending for approval

20  with the EPA.  This fact necessarily means that § 42301.16(c)

21  could not have been previously approved by the SIP, either

22  expressly or impliedly as defendants argue.

23      Defendants also contend that EPA's only recourse is to

24  disprove the SIP "like it did when it found the SIP conflicted

25  with the major source threshold."  Doc. 113, Supplemental Brief

26  in Opposition to Summary Judgment, Filed May 30, 2007.)  This

27  argument is legally incorrect.  Once the California SIP was

28  adopted it became controlling and binding upon the State of

**36**

1   California as a matter of federal law.  If the California SIP

2   contains regulations for the permitting of agricultural sources,

3   those regulations govern over any other state or district rules

4   that may conflict on the same issue.  To interpret the California

5   SIP, we look to the plain meaning of its language.

6       **ii.  Based on The Plain Meaning of California's SIP,
          Defendants Were Required to Obtain an ATC Permit At the

7          Time of Construction**

8       The recent decision in *Safe Air for Everyone v. EPA* speaks

9   directly to the legal issue of whether the § 42301.16(c)

10  exemption  applies.  *Safe Air* involved a conflict between an

11  Idaho State regulation governing field burning and the provisions

12  of the Idaho SIP.  The original Idaho SIP was approved by the EPA

13  in May of 1972.  *Safe Air*, 475 F.3d at 1101.  The original SIP

14  incorporated an Idaho state regulation on open burning that

15  included field burning as a type of allowable burning, although

16  containing significant limitations.  *Id.*  In 1993, the EPA

17  approved amendments to the Idaho SIP that included an Idaho air

18  pollution regulation containing a general prohibition on open air

19  burning and substantially changed those provisions.  *Id.*  The

20  regulation incorporated into the SIP listed categories of

21  allowable burning that no longer included field burning.  *Id.* at

22  1102.  In 2003, the EPA approved another set of amendments that

23  only updated the open field burning regulations to reflect a

24  recodification.  *Id.*  However, in 2005 the EPA approved

25  amendments to the SIP that incorporated Idaho Administrative Code

26  § 58.01.01.617 adding field burning as a category of allowed

27  burning.  *Id.*  This amendment was the first explicit reference to

28  those statutes in the SIP.  *Id.*  Plaintiffs submitted comments to

1  the EPA during the 2005 rule-making process and challenged the
2  approval of the amendments permitting field burning. *Id.* at
3  1103.

4       The issue before the Court was whether EPA's approval of the
5  field burning amendment in 2005 on the premise that the pre
6  existing Idaho SIP did not ban field burning, so that the
7  amendment only clarified what was already the case, was legally
8  sustainable. *See*, *Id.* at 1099.  The court ruled that the EPA did
9  not have the authority to incorporate the amendments adding field
10 burning as a permissable category.  The court rejected EPA's
11 arguments that in passing the amendment to the Idaho SIP it
12 considered Idaho's intent in drafting the SIP, conducted an
13 examination of the state's overall approach to field burning,
14 considered the legislative history of Idaho's provisions related
15 to agricultural burning[4], and considered various reports and
16 plans prepared by the State and various agreements signed by the
17 State.  *Safe Air*, 475 F.3d at 1104.  The court also rejected the
18 EPA's argument that its own past actions indicated it understood
19 agricultural burning to be allowed in Idaho and the SIP did not
20 prohibit it.  *Id.*

21      Instead the court applies the well-established
22 interpretation rule to the SIP, that the first look is to the

23
24 _____

25       [4]  Like *Safe Air*, Defendants also point to the legislative
   history of SB 700 in support of their argument.  However, it is
26 the plain meaning of the SIP that governs.  *Safe Air*, 475 F.3d at
   1103.  Other interpretive material such as the legislative
27 history or an agency's interpretation of the regulation should
   not be considered in light of the SIP's plain and unambiguous
28 meaning.  *Id.*

plain meaning of the plan.  *See, id.* at 1103 (citing to *Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission (BHPCA)*, 366 F.3d 692 (9th Cir. 2004).)[5]  To determine the requirements of the SIP the court examined the standards governing the interpretation of federal regulations.  *Id.*  "As a general interpretative principle, the plain meaning of regulation governs."  *Id.*  "Other interpretative materials, such as the agency's own interpretation of the regulation, should not be considered when the regulation has a plain meaning."  *Id.*  "The state's interpretation of the regulations incorporated into the SIP, even if binding as a matter of state law, is not directly dispositive of the meaning of the SIP."  *Id.*  "A SIP once approved by EPA, has the force and effect of federal law."  *Id.* at 1105.  "In accord with this general proposition, a state my not unilaterally alter the legal commitments of its SIP once EPA approves the plan."  *Id.*  Based on this reasoning, the court determined that the EPA did not justify or explain its approach in interpreting the SIP and the approach in amending the SIP could not be reconciled with the role of SIP's in the federal regulatory scheme.  *Id.* at 1104.

---

[5]  According to *Bayview Hunters*, "a regulation should be construed to give effect to the natural and plain meaning of its words."  *Bayview Hunters,* 366 F.3d at 698 (holding that the expected ridership increase was never described in the SIP as anything more than a target.); *See also*, *Crown Pac v. OSHRC*, 197 F.3d 1036, 1038 (9th Cir. 1999)(Because the SIP did "not on its face, require a ridership increase of 15%... by its plain language the SIP does not establish a mandatory requirement to increase transit ridership by a specified percentage weights heavily [and] weighs heavily against the conclusion that such an obligation can be imposed based upon the SIP.)

As in *Safe Air*, this case involves a conflict between a California State exemption for non major agricultural sources and the provisions of the California SIP.  On July 23, 1999 the EPA approves Rule 2010 as part of the SIP, making it federal law.  On June 25, 2003, upon the EPA's review of the California SIP, the EPA found that the plan is substantially inadequate and required California to revise it by removing the agricultural equipment exemption in Cal. Health & Saf. Code § 42301(e).  California passed SB 700 which amended Cal. Health & Saf. Code § 42301(e) to remove the agricultural exemption.  The bill was effective on January 1, 2004.  However, the bill also included the passage of Cal. Health and Saf. Code § 42301.16(c) and its exemption to permitting requirements for agricultural sources that emit below 12.5 tons VOC head/year.  There is no evidence that § 42301.16(c) was approved by the EPA.  There is no reference to § 42301.16(c) in the California SIP.  On June 15, 2004, the EPA approved the SIP which included the December 19, 2002 versions of Rule 2020 and 2201.[6]

As in *Safe Air*, the issue is whether California's § 42301.16(c) passed in SB 700 governs Defendants' permitting rather than District Rule 2010, as incorporated by the California SIP.  Defendants arguments are as follows:

1.    The state exemption controls because the SIP approval process cannot grant the District authority to require agricultural air permits in contravention of state law since the District

---

[6]   Per *Safe Air*, District Rules 2020 and 2201 also have the force and effect of federal law.

1

obtains its authority from the State.[7]

2

3

2.    States have absolute authority to enact state laws
      that establish how the national standards will be
      met before the EPA's approval of the SIP

4

5

6

3.    The only limitations that can be imposed on a
      state's ability to enact laws in connection with a
      SIP is that a state cannot amend a previously
      approved SIP through enactment of a state law
      after EPA approves the SIP.[8]

7

8

4.    The one half major source threshold exemption was
      contained in a state statute almost 8 months prior
      to the EPA's approval of the SIP

9

10

5.    The EPA had knowledge of this statute and
      expressly referenced that statute in its
      promulgating document.

11

In interpreting the SIP, the plain meaning of the plan

12

13

14

15

16

17

18

[7] Defendants cite *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984.) in support of their claims. *Bethlehem Steel* is distinguishable because it involves a partial approval by the EPA of an air pollution control regulation that applied to the polluter's non combustion emissions. *Bethlehem Steel* involved the EPA's partial approval of a single regulation. This case involves the different issue of the EPA's incorporation of district rules in their approval of the California SIP and how, as a result, the SIP conflicts with state exemptions for agricultural sources.

19

20

21

22

23

24

25

26

27

[8] In support of this argument, Defendants cite *Citizens for a Better Environment v. Deukmejian,* 731 F.Supp 2d 1159 (E.D. Cal. 2003). The *CBE* Court only stated that "[s]tates may not amend a SIP through the enactment of subsequent state law." 731 F. Supp. at 1455 n.10. The court relied on another decision which held that the "procedure set forth in Clean Air Act for obtaining modification of a SIP is [the] *exclusive* method by which a SIP amendment can be effected." *Id.* (emphasis in original). The decision does not state the "only" limitation that can be imposed on states' abilities to enact laws in connection with a SIP. Not only does *CBE* prevent a state from amending a SIP by enacting state law contrary to an EPA-approved SIP after the approval of the SIP, but *CBE* also prevents a state from amending a SIP at all except by following the procedures outlined in the Clean Air Act. Vanderham's reliance on *CBE* is misplaced.

28

41

governs. *Safe Air* establishes that California's interpretation
of regulations incorporated into the SIP, even if binding as a
matter of state law, is not directly dispositive of the meaning
of the SIP. *See, Safe Air,* 475 F.3d at 1103. Once the EPA
approved the SIP which included District Rule 2010, the rule had
the same force and effect as federal law. *See, Id.* Accordingly,
California may not unilaterally alter the legal requirements of
Rule 2010 as adopted in the state SIP and approved by the EPA.
*Id.* The ruling in *Safe Air* directly contravenes Defendants'
arguments that States have "absolute authority" to enact state
laws that establish how NAQQS will be met before the EPA's
approval of the SIP. A state's authority to enact laws for non
attainment areas to meet the requirements of the CAA is not
absolute. State authority is subject to federal law as
established by the CAA and the provisions of the SIP. *See, El
Comité*, 416 F. Supp. at 934, quoting *Carey*, 535 F.2d at 178.

Defendants rejoin that *Safe Air* was not a preemption case
and does not apply here. According to Defendants, *Safe Air* was a
case involving the narrow question of whether the EPA had
misunderstood the previous SIP to allow field burning since it
did not expressly prohibit it, and, as a result, went beyond the
scope of its authority by incorporating Idaho Administrative Code
§ 58.01.01.617 in to the SIP. Defendants argue that *Safe Air*
found the EPA misread the SIP's prohibition on field burning and
remanded to the District court to consider Plaintiffs'
objections. However, in its reasoning *Safe Air* expressly holds:

1.   the plain meaning of the SIP governs,

2.   a SIP, once approved by EPA, has the force and

**42**

1

2

3

        effect of federal law, and

    3.    a state may not unilaterally alter the legal
          commitments of its SIP once EPA approves the plan.

*Safe Air*, 475 F.3d at 1105.   The court in *Safe Air* held that

because the prohibitory language of the preexisting Idaho SIP

plainly applies to field burning, federal law banned field

burning in Idaho prior to the EPA's 2005 approval of the SIP

amendment.   *Id*. at 1108.   Similarly, because the language of Rule

2010 was adopted in the California SIP and plainly applies an ATC

requirement to any agricultural source emitting VOC's, federal

law currently requires an ATC for those agricultural sources

prior to construction.

    Based on a plain reading of the SIP, there is no ATC permit

exemption for stationary sources which have actual emissions less

than half the major source thresholds.

### iii.  There Is No Clearly Expressed Administrative Intent to the Contrary and Interpreting the Plain Meaning Will Not Lead to Absurd Results.

    "The plain language of the Regulation will not control if

'clearly expressed administrative intent is to the contrary or if

such plain meaning would lead to absurd results.'"   *Id.*   "The

notice requirements of the APA, *5 U.S.C. §§ 552(a)(1), 553(b)*,

require that some indication of the regulatory intent that

overcomes plain language must be referenced in the published

notices that accompanied the rulemaking process."   *Id.* at 1105-

1106.   "Otherwise, interested parties would not have the

meaningful opportunity to comment on proposed regulations that

the APA contemplates because they would have had no way of

knowing what was actually proposed."   *Id*. at 1106.   "Such a mode

**43**

of interpretation is particularly sensible under the CAA which
requires that judicial challenges be filed within sixty days of
[a] SIP approval." *Id.*; *See also,* 42 U.S.C. 7607(b)(1). "If an
agency can promulgate a regulation with plain language that
dictates one meaning but later interpret it according to an
intent indicated neither in the regulatory language nor in the
promulgation documents, parties may depend on the plain meaning
of the regulation in deciding not to launch a challenge within
the prescribed time limit." *Id.* "If, later, the agency relies
on an undisclosed intended meaning, interested parties might be
foreclosed from challenging the regulation, contrary to the
statutory permission to launch such challenges." *Id.* at 1106-
1107.

In support of their argument that they were exempt under §
42301.16(c) from obtaining a permit, Defendants further argue
that the EPA had knowledge of the statute, that the statute was
enacted almost eight months prior to the EPA's approval of the
SIP, and that the EPA referenced SB 700 in its final approval.
As a result, the EPA must have meant to approve the exemptions in
SB 700 since it referenced the bill in the SIP.  This argument
has no legal merit in the Ninth Circuit.

Defendants have provided no persuasive authority to justify
departure from the requirement that the plain language of the SIP
governs.  Defendants do not show any clearly expressed
administrative intent that is contrary to a plain reading of the
SIP.  Defendants do not argue that a plain reading of the SIP
would lead to absurd results.  Here, the EPA's approval of Rule
2010 in 1992 predates SB 700 by more than a decade so that the

**44**

operative version of Rule 2010 could not possibly include the provisions of SB 700.  There is no indication that the public notices of proposed rulemaking to approve Rules 2020 and 2201 as part of the SIP included any discussion of SB 700 in compliance with the notice requirements of the APA.  68 Fed. Reg. 7330 (Feb 13, 2003); *See also*, *Safe Air*, 475 F.3d at 1105-1106.  EPA's passing mention of SB 700 in the final rule approving rules 2020 and 2201 does not satisfy the *Safe Air* criteria that the intent must be expressed in the published notices to allow for meaningful public comment on regulations.  *Safe Air*, 475 F.3d at 1105-1106.

The Ninth Circuit emphasized that the public must be made aware of the proposed contents of the SIP in order to have an opportunity to meaningfully comment on them.  *Id.*  Mentioning SB 700 in the final rule approving 2020 and 2201 after the public comment period had closed did not provide the opportunity for public comment contemplated by *Safe Air.*  Because the EPA did not provide for public comment on SB 700 exemptions in the notices for the approval of the rules, the EPA did not express an intent to include the exemptions in the SIP.

The passing reference to SB 700 in the final rule does not express an intent to include the SB 700 exemptions in the SIP. In *Safe Air*, Idaho law allowed field burning, but the plain language of the Idaho SIP at issue did not.  The EPA argued, as Defendants in this case argue, that the approval of an Idaho anti pollution strategy in a separate rulemaking that referenced Idaho's field burning statute demonstrated that the EPA understood field burning to be allowed by the SIP.  *Safe Air*, 475

**45**

F.3d at 1107. n.11, 1103 n.3.  Such a passing mention was not enough; the Court noted that "EPA... did not refer to the provisions on field burning when explaining its decision to approve the strategy."  *Id.* at 1107, n. 11.  Similarly, here, although the EPA mentioned SB 700 in the final rule, it did not refer to the exemptions that Vanderham raises in either its published notices or in the final rule.  *See* 68 Fed. Reg. 7330; 69 Fed. Reg. 27837.  The Final rule noted that SB 700 removed an illegal blanket exemption for all agricultural sources from CAA requirements.  69 Fed. Reg. 27838.  Such a mention of SB 700 in the final rule, approving Rules 2020 and 2201 in connection with the removal of a separate exemption, does not express an intent to nor does it provide notice about the inclusion of other exemptions.

According to the plain meaning of the California SIP and its incorporation of Rule 2010, Defendants were required to obtain an ATC permit at the time of construction.  It is undisputed that Defendants did not obtain an ATC permit.

Motion for summary judgment on the ATC permit issue is **GRANTED IN FAVOR OF PLAINTIFFS.**[9]

---

[9]  The applicability of Rule 2010 is a legal issue that is resolved by *Safe Air.*  In the original motion for summary judgment, Defendants did not address the legal issue and instead attempted to raise triable issues of fact by producing the following evidence:

1.  A December 12, 2005 letter from the District to Defendants where the District reasons that the ATC permit program came into effect after Defendants commenced construction of their dairy.  Even though it is undisputed that the Dairy is a "new source" the District treated the Dairy as an existing source.

**D.   There Is No Dispute that Defendants Are in Violation of Rule 2201 for Failing to Install BACT Technology and Purchase Offsets.**

   **i.   Defendants Have Violated Rule 2201 § 4.1.1 by Emitting Above the 2 lbs/day Allowable Threshold for Emissions Units**

Section 4.1.1 of Rule 2201 states that BACT shall be required for "any new emissions unit or relocation from one Stationary Source to another of an existing emissions unit with a potential to emit exceeding 2.0 lbs in any one day."  In their motion for summary judgment, Plaintiffs argue that Defendants potential for VOC emissions exceeds the daily allowable threshold for emissions units.  Defendants contest Plaintiffs' calculations and Plaintiffs' use of blueprint capacity to determine the daily

---

2.   In the "White Paper" issued by the California Air Pollution Control Officers Association ("CAPCOA"), the admissibility of which is also in dispute in this order, which discusses post SB 700 rules.  Plaintiffs moved to strike the White Paper for Defendants' failure to properly authenticate the White Paper.  According to the White Paper "agricultural sources that were in existence prior to January 1, 2004 and are now being permitted will be considered 'grand fathered' under NSR, which means they are not subject to review until they are modified… New agricultural sources which initiate construction or installation after January 1, 2004, may be subject to NSR if their emissions reach the applicable thresholds for a 'major source'.  The timeline for submitting permit applications, and the specific requirements that apply will be determined by the local air districts."

   The White Paper is an advisory document that is not legally binding.  Because the issue of Rule 2010 is a legal one, arguments surrounding the admissibility of the letter and the White Paper are moot.  Further at the May 21, 2007 hearing the parties were informed that the White Paper would be considered only for the limited purpose of understanding the implementation of District Rules.

allowable thresholds.   However, Defendants do not offer any evidence to rebut the sworn affidavit by Plaintiffs' expert testifying to the accuracy of the calculations.

In support of their argument, AIR provides calculations using both the emissions factors advocated by Vanderham[10] as well as their own:

Table 1:  VOC Emissions Per Day (lbs/day) Based on Current
          Emissions Factor (19.3 lbs VOC/head/year)

BACT Threshold = 2 lbs/day of VOC

| Emissions Unit | Vanderham Cow Count(1320 milk cows + support stock) | Blueprint Capacity(1624 milk cows + support stock) |
|---|---|---|
| Cow Housing and Feed | 64.2 | 76.3 |
| Milking Center | 3.3 | 4.0 |
| Liquid Manure Handling | 13.3 | 15.7 |
| Land Application | 23.8 | 28.2 |

Table 2:  VOC Emissions Per Day (lbs/day) Based on Old Emissions Factor (12.8 lbs/VOC/head/year)

BACT Threshold = 2 lbs/day of VOC

| Emissions Unit | Vanderham Cow Count (1320 milk cows + support stock) | Blueprint Capacity (1624 milk cows + support stock) |
|---|---|---|
| Cow Housing and Feed | 43.2 | 50.6 |
| Milking Center | 2.2 | 2.7 |

---

[10] Vanderham argues that Plaintiffs' calculations are inaccurate because they are based on a new emissions factor of 19.3 lbs/VOC/head/year.  According to Vanderham, the emissions threshold that applied at the time of construction was 12.8 lbs/VOC/head/year.  Both emissions factors yield emissions above 2 lbs/day thus triggering the requirement to install BACT.

1

2

3

| | | |
|---|---|---|
| Liquid Manure Handling | 8.8 | 10.4 |
| Land Application | 15.8 | 18.7 |

4

5

6

7

8

9

10

11

        Based on the evidence provided by the Plaintiffs, even using
the emissions factor advocated by the Defendants, the Dairy's VOC
emission for three of the four emissions units far exceeds the 2
lbs/day threshold.  Only the milking center slightly exceeds the
threshold.  However, Defendants dispute the calculations arguing
that the emission factor they use has not been approved by the
Air District or EPA.  Defendants have not presented any evidence
to support their arguments.

12

13

14

15

16

17

18

19

20

21

22

23

24

        Defendants also argue that AIR has not proved Vanderham's
non-fugitive emissions meet the major source threshold.
Defendants misunderstand the issue.  AIR has not pleaded a claim
against Defendants that Vanderham is a major source.  Whether
Vanderham is a major source is not material to AIR's claims.  AIR
claims that Vanderham has emissions units that exceed the daily
VOC thresholds of 2 lbs/day.  The issue is whether the
Defendants' emissions units exceed the BACT threshold of two
pounds per day of VOC, not whether Vanderham, emits less than the
12.5 ton/year threshold which triggers the § 42301.16(c)
exemption under state law.  The exemption does not apply to
Defendants in this case because it is not included in the
federally approved SIP.

25

26

        Even viewing the evidence in a light most favorable to
Defendants, there is no material issue of fact disputed that four

27

28

1    of their emissions units exceed the 2.0 lbs/day threshold.[11]

2        **ii.   There is No Triable Issue of Fact that Defendants Were**
3                **Required to Install BACT Pursuant to District Rule 2201**
                 **as Incorporated in the California SIP.**

4        Rule 2201 defines BACT as the most stringent emission
5    limitation or control technique of the following:

6        1.   Achieved in practice for such category or class of
7            source;

8        2.   Contained in any State Implementation Plan
9            approved by the Environmental Protection Agency
10           for such category and class of source. A specific
11           limitation technique or control technology shall
12           not apply if the owner of the proposed emissions
13           unit demonstrates to the satisfaction of the APCO
14           that such a limitation or control technique is not
15           presently achievable; or

16       3.   Contained in an applicable federal New Source
17           Performance Standard; or

18       4.   Any other emission limitation or control
19           technique, including process and equipment changes
20           of basic or control equipment, found by the APCO
21           to be cost effective and technologically feasible

22

23

24       [11] Defendants filed an objection to Plaintiff's expert
     testimony of William Powers.  The objection was filed the Friday
25   evening before the May 21 hearing.  Defendants objection was
     denied as untimely at the May 21, 2007 hearing on this motion.
26   However, the parties were assured that Powers' opinion would not
     be considered to the extent that it exceeded the scope of his
27   expertise.  Powers' calculations have not been contradicted by
     any evidence from Defendants.  Defendants have failed to provide
28   further evidence to rebut Powers' calculations.

1          for such class or category of sources or for a
2          specific source.

3  Rule 2201 § 3.9.  Potential to Emit is defined as the "maximum
4  capacity of any emissions unit to emit a pollutant under its
5  physical and operational design." Rule 2201 § 3.27.  The
6  Potential to Emit from the dairy's emissions units includes
7  fugitive emissions. Rule 2201 § 3.19 ("Fugitive emissions shall
8  be included in all calculations, except as provided in Section
9  3.24 [major modifications]")

10       Plaintiffs argue that C&R Vanderham Dairy has four emissions
11  units which have a Potential to Emit more than two pounds of VOC
12  per day and that Defendants have failed to install BACT on the
13  four emissions units.  Vanderham admits that the District rules,
14  including Rules 2010 and 2201, are "emission standards or
15  limitations" as defined by 42 U.S.C. §§ 7604(f), 7604(k), which
16  define an "emission standard or limitation" to include any
17  standard or limitation approved as part of the State
18  Implementation Plan ("SIP").  (PSUF No. 8.)  There is no dispute
19  that the District has not undertaken a BACT analysis for the C&R
20  Vanderham Dairy. (PSUF No. 52.).  There is no dispute that  C&R
21  Vanderham Dairy is a stationary source of air pollution, within
22  the meaning of the Clean Air Act and Rule 2201.  (PSUF No. 43.)
23  There is also no dispute that C&R Vanderham Dairy is a non major
24  stationary source pursuant to state law.  Vanderham admits that
25  the cow housing and feeding areas, the milking center, the liquid
26  manure handling area, the solid manure handling area, and the
27  land application area are emissions units as defined by § 3.18 of
28  Rule 2201.  (PSUF No. 45.)

**51**

1    According to Plaintiffs, Defendants cannot have installed
2  BACT if the APCO has not determined what is cost-effective or
3  technologically feasible for the dairy.  Plaintiffs have
4  submitted sworn testimony by District staff that states the
5  District Staff determines BACT requirements on a case-by-case
6  basis during the ATC permit process.  (PSUF NO. 50)  Plaintiffs
7  argue that the District has not issued a permit to Defendants and
8  has therefore not undertaken a BACT analysis.  As a result,
9  Defendants cannot have installed BACT when it constructed the
10 Dairy.

11   Defendants respond by arguing that they could not possibly
12 have installed BACT without a determination of BACT by the Air
13 District.  Defendants contend the Air District determined that an
14 ATC permit was not required but that a permit to operate was
15 required.  Accordingly, because the District issued Defendants a
16 Permit to Operate, the District must have implicitly determined
17 that no BACT was needed.  This argument does not necessarily
18 follow.  Defendants provide no evidence from the District or by
19 an APCO that they were not required to install BACT.  Nor do
20 Defendants offer evidence that a BACT analysis can only be
21 undertaken alongside an ATC permit determination.

22   Section 4.1.2 of Rule 2201 requires BACT for an existing
23 source with a permit to operate if the source exceeds 2.0
24 lbs/day.  It is undisputed that Defendants applied for a permit
25 to operate on October 28, 2005 and were granted a permit on April
26 3, 2007.  BACT analysis applies independent of the ATC permit
27 requirement because obligations are independent and required
28 under different rules.  There is no indication in the record

**52**

1  whether, in practice, the District separates the permitting
2  process from the BACT evaluation.  Also, while the parties'
3  dispute over the calculations raises an issue of fact as to
4  whether C&R Vanderham Dairy indeed emits more than 2.0 pounds in
5  any one day, Defendants have provided no evidence to the
6  contrary.

7       Defendants' viable argument is that it is unclear whether
8  the Dairy can install BACT when the District has failed to
9  conduct a BACT analysis.  While, technically, the evidence shows
10 that Defendants violated the SIP, it is unclear in the record
11 whether they could have installed BACT without the District
12 conducting the analysis.  Plaintiffs have submitted a letter to
13 Defendants from the Air District that states "the District cannot
14 condone the proposed construction activities until the emission
15 factor issue is settled on August 1, 2005, since permits may be
16 required for the proposed dairy.  If C&R Vanderham Dairy
17 continues with the construction, they proceed at their own
18 risk."]

19      Absent evidence to the contrary, which Defendants have not
20 provided, Defendants have exceeded the allowable emissions
21 threshold of 2 lbs/day and were required to install BACT for four
22 of their emissions units.

23      Plaintiffs motion for summary judgment on the BACT issue is
24 **GRANTED.**

25

26          **iii.  There is No Triable Issue that Defendants Were Required
                to Purchase Offsets**

27

28      District Rule 2201 requires agricultural sources to purchase

**53**

offsets if their Post-Project Stationary Source Potential to Emit
("SSPE2") is above 20,000 pounds (10 tons) of VOC per year.   Rule
2201 § 4.5.   Plaintiffs argue that Defendants' SSPE2 for VOC is
greater than 20,000 pounds (10 tons) per year and were thus
required to purchase offsets.   Plaintiffs claim that according to
Defendants' own calculations C&R Vanderham Dairy's "total annual
VOC emissions" are at 24,861.9 pounds or 12.4 tons, above the
offsets threshold of 10 tons a year.   Vanderham's calculations
used an outdated emission factor of 12.8 pounds of VOC per head
per year.   The current emission factor is 19.3 pounds per head
per year.   Using the current emission factor, Plaintiffs' expert
places the C&R Vanderham Dairy's SSPE2 for VOC much higher, at
22.6 tons per year based on the maximum capacity shown by the
blueprints for the C&R Vanderham Dairy and at 19.2 tons per year
based on the maximum capacity provided by Vanderham.   By any of
these measures, the C&R Vanderham Dairy has an SSPE2 greater than
10 tons per year.   Therefore, Vanderham was required to purchase
offsets.

Defendants argue that there is a genuine issue of fact as to
whether they were required to purchase offsets.   Defendants
dispute Plaintiffs' calculations of C&R Vanderham Dairy's daily
VOC emissions.   According to Defendants, Plaintiffs run through
any number of calculations to get there and that Plaintiffs
completely ignore Section 4.6.9 of Rule 2201 which exempts
agricultural sources.[12]   Defendants continue to argue that

---

[12]   District Rule Section 4.6 governs emissions offset
exemptions.   According to the rules, "Emission offsets shall not
be required for... agricultural sources to the extent provided by

**54**

1  Plaintiffs have provided no authority that requires C&R Vanderham

2  Dairy to obtain offsets when federal law requires permits, of

3  which offsets are a part, for only major stationary sources.

4      It appears the exemption for ag sources does not apply as it

5  was not included in the SIP.  Defendants have not offered

6  evidence to the contrary.  Defendants have not offered contrary

7  evidence that rebut Plaintiffs' expert's calculations.

8

9  **D.   Amount of Days in Violations**

10     According to Plaintiffs, the number of days of violation is

11 determined by the language of the SIP.  *Nat'l Parks Conservation*

12 *Assoc. v. TVA*, 480 F.3d 410, 418 (6th Cir. 2007.)   Courts

13 interpret the SIP "based on its plain meaning when such meaning

14 is apparent, not absurd, and not contradicted by the manifest

15 intent of the EPA, as expressed in the promulgating documents

16 available to the public.  *Safe Air*, 475 F.3d at 1108.  Pursuant

17 to the SIP, Plaintiffs claim that Vanderham is liable for a total

18 of 4,008 days of violations.[13]

19

20 California Health and Safety Code § 42301.18(c)..."  District
   Rule 4.6.9  However, it is undisputed that section 4.6.9 does not
21 exist in the EPA approved SIP, which includes the December 19,
   2002 version of Rule 2201 but not the September 21, 2006 version
22 on which Vanderham bases its argument.  *See* 40 C.F.R. §
   52.220(c)(311)(i)(B)(1).  Per *Safe Air*, the agricultural
23 exemption of Section 4.2.9 does not apply to Defendants.

24

25     [13] According to Plaintiffs, the number of days of violation
   is determined by the language of the SIP.  It is undisputed that
26 Vanderham initiated construction on or after July 15, 2005. PSUF
   ¶¶ 29, 35, 37.  Therefore, Plaintiffs seek summary judgment on at
27 least 2,704 days of violation for the ongoing failure to install
   BACT at four emissions units (676 x 4) and at least 676 days of
28 violation for the ongoing failure to purchase offsets.

1    Defendants alternatively argue that if violations are found,

2  they should be limited to a single point in time because the

3  requirement to secure a pre-construction permit applies only

4  prior to construction.  Defendants further argue that installing

5  BACT and purchasing Offsets are functions of the Air District and

6  are so embedded in the permit process that Defendants could not

7  have satisfied such requirements without the Air District's

8  assistance.  In support of their argument Defendants cite to *New*

9  *York v. Niagra Mohawk Power Corp.*, 263 F. Supp. 2d 650, 662

10 (W.D.N.Y. 2003).[14]

11    Plaintiffs argue that the violations of the SIP proven here

12 are not limited to a single day.  The number of days of violation

13

14 ────────────────

   Plaintiffs calculate the number of days as the total days from
15 July 15, 2005 through May 21, 2007, the date of oral argument on
   this Motion.  *See* 42 U.S.C. § 7413(e)(2) (days of violation
16 presumed to continue until violator establishes "continuous
   compliance has been achieved").  However, violations may continue
17 past that date.  Moreover, Plaintiffs seek summary judgment on
   628 days of violations for the failure to obtain an ATC permit.
18 AIR calculates the number of days as all days from July 15, 2005
   through April 3, 2007, when the District issued a Permit to
19 Operate to the C&R Vanderham Dairy.

20
   [14]  Defendants argue that ""[a] given construction or
21 modification only occurs once.  If a Permit is not obtained for
   that particular project then the preconstruction permit
22 requirement of the Clean Air Act has been violated.  However, the
   requirement to secure a pre-construction permit applies prior to
23 construction or modification..., thus, a violation of the Clean
   Air Act pre-construction permit requirement is singular in nature
24 and does not constitute an on going violation."  *Niagra Mohawk*
   263 F. Supp. 2d at 662; *See also*, *United States v. Campbell Soup,*
25 *Co.,* 1997 U.S. Dist. LEXIS 3211, *5-8 (E.D. Cal. 1997).
   Defendants argue that because the BACT analysis is embedded in
26 the permit process and the District determined that Defendants
   were not required to obtain a permit, the violation should be
27 limited to one day.

28

**56**

is determined by the language of the SIP. *Nat'l Parks Conservation Assoc. v. TVA*, 480 F.3d 410, 418 (6th Cir. 2007). Courts interpret the SIP "based on [the SIP's] plain meaning when such a meaning is apparent, not absurd, and not contradicted by the manifest intent of EPA, as expressed in the promulgating documents available to the public." *Safe Air for Everyone*, 475 F.3d at 1108.  Plaintiffs argue that Vanderham does not address the language of the SIP it must abide by; it instead relies on authority interpreting different language in the Act.

Vanderham relies on *Niagara Mohawk* and *Campbell Soup Co.* to assert that because the construction only occurs once, Vanderham's failures to comply with law constitute only a single violation of the SIP.  Opp. at 20-21.  The cases do not support Vanderham's assertion.  First, *Niagara Mohawk* does not interpret the California SIP; rather, it interprets the language of the Act itself.  263 F. Supp. 2d at 661-62 (interpreting pre-construction permit requirement for major sources in the Act).  However, AIR is suing under the SIP's requirements.  The SIP may be more stringent than the CAA, as it is here.  Second, the *Campbell Soup* decision states that "when violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." 1997 U.S. Dist. LEXIS 3211, *7 (E.D. Cal. 1997).

Here, Rule 2010 expressly states that an ATC "shall remain in effect until the Permit to Operate the source operation for which the application was filed is granted or denied, or the application is cancelled."  Rule 2010 § 3.0.  Unlike in *Campbell*

**57**

*Soup*, by the very terms of the regulation, Vanderham's violations here continued until its application for Permit to Operate was granted on April 3, 2007. Vanderham does not cite any authority that holds that BACT and offset violations are singular violations. The BACT provision simply states that BACT "shall be required" for any emissions unit exceeding emissions of two lbs/day of VOC. Similarly, offsets "shall be required" if the SSPE2 exceeds 10 tons a year of VOC. These requirements apply any time the thresholds are exceeded; the rule places no further restriction on their application. Thus, the requirements continue to apply, and a violation of the requirements continues until rectified. No Ninth Circuit cases assess the number of days of violations under the California SIP. The CAA 42 USC § 7413(e)(2) states the following:

> For purposes of determining the number of days of
> violation for which a penalty may be assessed under
> subsection (b) or (d)(1) of this section, or section
> 304(a) [42 U.S.C. § 7604 (a)], or an assessment may be
> made under section 120 [42 USCS § 7420], where the
> Administrator or an air pollution control agency has
> notified the source of the violation, and the plaintiff
> makes a prima facie showing that the conduct or events
> giving rise to the violation are likely to have
> continued or recurred past the date of notice, the days
> of violation shall be presumed to include the date of
> such notice and each and every day thereafter until the
> violator establishes that continuous compliance has
> been achieved, except to the extent that the violator

**58**

1  can prove by a preponderance of the evidence that there

2  were intervening days during which no violation

3  occurred or that the violation was not continuing in

4  nature.

5  The determination of this issue depends largely on disputed

6  issues of fact.  There is no indication that, prior to this

7  litigation, the dairy was notified by the District or an APCO

8  that they were in violation.

9      The summary judgment motion as to days of violation is

10  DENIED.

11

12  **7.  MOTION TO STRIKE DEFENDANTS CROSS MOTION FOR SUMMARY JUDGMENT**

13      Fed. R. Civ. P. 12(f) provides that "redundant, immaterial,

14  impertinent, or scandalous matters" may be "stricken from any

15  pleading."  Fed. R. Civ. P. 12(f).  "[O]nly pleadings are

16  subject to motions to strike."  *See Sidney-Vinstein v. A.H.*

17  *Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  However, a

18  "motion to strike" materials that are not part of the pleadings

19  may be regarded as an "invitation" by the movant "to consider

20  whether [proffered material] may properly be relied upon."

21  *United States v. Crisp*, 190 F.R.D. 546, 551 (E.D. Cal. 1999)

22  (quoting *Monroe v. Board of Educ.*, 65 F.R.D. 641, 645 (D. Conn.

23  1975).

24      Motions to strike are disfavored and infrequently granted.

25  *See Pease & Curran Ref., Inc. v. Spectrolab, Inc.*, 744 F. Supp.

26  945, 947 (C.D. Cal. 1990), abrogated on other grounds by *Stanton*

27  *Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

28

**59**

1  "[M]otions to strike should not be granted unless it is clear

2  that the matter to be stricken could have no possible bearing on

3  the subject matter of the litigation. *Colaprico v. Sun*

4  *Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)

5  (citation omitted).

6  **A.   Defendants' Motion for Summary Judgment is Untimely and**
       **in Violation of Local Rule**
7

8        Local Rule 78-230(e) states:

9        "Any counter-motion or other motion that a party may
         desire to make that is related to the general subject
         matter of the original motion shall be served and filed
10       with the Clerk in the manner and on the date prescribed
         for the filing of opposition.  In the event such
11       counter-motion or other related motion is filed, the
         Court may continue the hearing on the original and all
12       related motions so as to give all parties reasonable
         opportunity to serve and file oppositions and replies
13       to all pending motions."

14       Air filed its motion on April 19, 2007.  Defendants filed

15  their Opposition on May 4, 2007.  The hearing on the motion for

16  summary judgment was held on May 21, 2007.  Based on the local

17  rule, any opposition should have been filed at least by May 7,

18  2007 or 14 calendar days before the May 21 hearing.  At the May

19  21, 2007 hearing, Defendants' request to file a supplemental

20  brief on the sole issue of whether Rule 2010 applied to them was

21  granted.  Defendants were notified by minute order on May 21,

22  2007 that upon filing the supplemental briefs the matter would be

23  deemed submitted.  Defendants were not given leave to file a

24  cross motion for summary judgment at the hearing on May 21, 2007.

25  **B.   Defendants' Motion for Summary Judgment Has No Possible**
       **Bearing on the Subject Matter of the Litigation**
26

27       Defendants have parlayed the opportunity to file a

28  supplemental brief into filing an additional cross motion for

**60**

1  summary judgment.  Defendants cross motion for summary judgment

2  raises no new argument and merely repeats, albeit at greater

3  length, the arguments set forth in their opposition to

4  Plaintiffs' motion for summary judgment (Doc. 96) and in their

5  supplemental brief (Doc. 113).

6      Defendants' first argument in their cross motion for summary

7  judgment is that the EPA acknowledged that state law establishes

8  an Air District's permitting authority and expressly considered

9  SB 700 when it gave final approval to Rules 2020 and 2201.  In

10  support of their argument, Defendants provide the entire

11  legislative history of the approval process for SB 700.[15]

12  Defendants also reiterate that the District cannot exceed the

13  permitting authority granted to it by state law.  However,

14  Defendants have submitted no legal authority to show that *Safe*

15  *Air* does not control this case.  Defendants attempt fails to

16  reframe the issue to one that solely involves whether the EPA's

17  approval of the SIP can modify or enlarge the permitting

18  authority granted to the air district by the state of California.

19  This, is not the issue.  The first issue is whether the language

20  of the California SIP superceded state regulations not

21  incorporated into its provisions.  The Ninth Circuit in *Safe Air*,

22  a case with facts almost identical to this one, addressed the

23  issue and held that the language of the SIP functions with the

24

25      [15] However, according to *Safe Air*, "As a general

26  interpretative principle, the plain meaning of regulation
   governs."  *Safe Air*, 475 F.3d at 1103.  "Other interpretative

27  materials, such as the agency's own interpretation of the
   regulation, should not be considered when the regulation has a

28  plain meaning."  *Id.*

**61**

same "force and effect" as federal law and supercedes any conflicting state law.  Defendants present no new arguments or law in their untimely cross motion for summary judgment on the arguments previously addressed.

Plaintiffs' motion to strike Defendants' cross motion for summary judgment is **GRANTED.**

## 8. <u>CONCLUSION</u>

Motion for summary judgment on the issue of whether Defendants violated rule 2010 by failing to obtain an ATC permit is **GRANTED in favor of Plaintiffs.**

Motion for summary judgment on the issue of whether Defendants violated Rule 2201 § 4.1.1 by failing to install BACT is **GRANTED in favor of Plaintiffs.**

Motion for summary judgment on the issue of whether Defendants violated District Rule 2201 § 4.5 by failing to purchase offsets is **GRANTED in favor of Plaintiffs.**

The days of Defendants' violations cannot be determined as a matter of law.


IT IS SO ORDERED.

Dated:    September 24, 2007              /s/ Oliver W. Wanger
                                         UNITED STATES DISTRICT JUDGE